ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702.330.4505
Facsimile: 702.825.0141
Email: andrew@mlolegal.com

*Counsel for Plaintiff*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| CLINT WILKERSON, derivatively on behalf of BIOVIE INC.,<br><br>Plaintiff,<br><br>v.<br><br>CUONG DO, JOSEPH PALUMBO, JIM LANG, SIGMUND ROGICH, MICHAEL SHERMAN, ROBERT HARIRI, and STEVE GORLIN,<br><br>Defendants,<br><br>and<br><br>BIOVIE INC.,<br><br>Nominal Defendant. | Case No. 2:25-cv-1716<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Clint Wilkerson ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively on behalf of Nominal Defendant BioVie Inc. ("BioVie" or the "Company"), brings this Verified Shareholder Derivative Complaint against Cuong Do ("Do"), Joseph Palumbo ("Palumbo"), Jim Lang ("Lang"), Sigmund Rogich ("Rogich"), Michael Sherman ("Sherman"),

Robert Hariri ("Hariri"), and Steve Gorlin ("Gorlin") (collectively, the "Individual Defendants" and, together with BioVie, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by BioVie with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a shareholder derivative action brought against certain BioVie officers and members of BioVie's Board of Directors (the "Board") that seeks to remedy wrongdoing the Individual Defendants committed from at least between December 7, 2022 and November 28, 2023, inclusive (the "Relevant Period").

2. BioVie is a clinical-stage biopharmaceutical company that develops drug therapiesfor the treatment of neurological and neurodegenerative disorders and advanced liver disease.

3. On August 5, 2021, BioVie initiated a Phase 3 clinical trial, referred to as the NM101 study (the "Study" or "NM101"), to evaluate its lead drug candidate, "NE3107." According to BioVie, NE3107 had the potential to be "an entirely new medical approach" to treating Alzheimer's Disease and Parkinson's disease. BioVie intended to rely on the Study to support a New Drug Application ("NDA") for marketing approval from the U.S. Food & Drug Administration ("FDA").

4. Throughout the Relevant Period, the Individual Defendants issued or caused the Company to issue materially false and misleading statements concerning the NM101 Study

including, among other things, the Study's patient enrollment status, target "completion" dates, and the quality and accuracy of the clinical data obtained therefrom.

4. In December 2022, BioVie was forced to undergo a "for-cause" audit at one of NM101's main sites after members of the clinical trial staff detected evidence of patient data fraud. Over the course of the audit, third-party investigators uncovered, among other things, falsified medical history records, and recommended that the Company cease enrollment in the Study and close the site.

5. In August 2023, a second "for-cause" audit resulted in nearly identical findings of additional fraudulent patient data. The audit report noted observations with the site's record-keeping procedures that violated Good Clinical Practices ("GCPs") as well as observations relating to missing testing information undermining the credibility of data collected. The auditor recommended further investigation to determine the root cause of the missing data and/or inability to validate the data in the patient files in order to confirm whether the patients were eligible for the final data analysis for the Study.

6. The truth first emerged on November 8, 2023 when the Company filed its quarterly report with the SEC (the "Q1 2024 10-Q"), revealing that "during routine monitoring of blinded data from our Phase 3 study (NCT04669028) of NE3107, we uncovered what appears to be potential scientific misconduct and significant non-compliance with GCPs and regulation at six sites." The Company also admitted that "these findings of potential scientific misconduct and significant GCP violations may call into question the rigor, robustness and validity of the entire data set for this study (NCT04669028) and may require additional clinical studies to confirm the final results of the study."

7. On this news, the price of the Company's stock fell $3.03 per share, from a closing 26 price of $4.99 per share on November 28, 2023 to close at $1.96 per share on November 29, 2023.

8. Throughout the Relevant Period, the Individual Defendants issued or caused BioVie to issue statements that were materially false and misleading and caused the Company to fail to disclose the following: (i) the numbers of patients enrolled in the NM101 Study; (ii) the expected timing of primary completion of the Study; (iii) optimism about blinded data; and (iv) risks related to the clinical trial process. As a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

9. In light of the Individual Defendants' misconduct, the Company as well as Defendants Do and Palumbo were named as defendants in a now-consolidated federal securities fraud class action lawsuit in this Court, captioned *In re BioVie Inc. Securities Litigation*, 3:24-cv-00035 (D. Nev.) (the "Securities Class Action"). The Securities Class Action has further subjected BioVie to the need to undertake internal investigations and to implement adequate internal controls, as well as exposed the Company to considerable class-wide liability.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

11. This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

13. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because BioVie's principal executive offices are located in this district, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

**PARTIES**

15. Plaintiff is a current shareholder of BioVie and has continuously held BioVie stock at all relevant times.

16. Nominal Defendant BioVie is a Nevada corporation and its principal executive offices are located at 680 West Nye Lane, Suite 201, Carson City, Nevada. The Company's common stock trades on the Nasdaq under the ticker symbol "BIVI."

17. Defendant Do has served as a Company director since 2016 and as the Company's Chief Executive Officer ("CEO") and President since April 2021. According to the proxy statement filed on Schedule 14A on September 27, 2024 with the SEC (the "2024 Proxy Statement"), in 2024, Defendant Do received $777,082 in compensation from the Company.

18. Defendant Palumbo has served as the Company's Chief Medical Officer ("CMO") since November 2021. According to the 2025 Proxy Statement, Defendant Palumbo received $669,584 in total compensation from the Company.

19. Defendant Lang has served as a Company director since 2016 and as Chairman of the Board since March 2023. Defendant Lang also serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, Defendant Lang received $171,105 in total compensation from the Company.

23. Defendant Rogich has served as a Company director since June 2020. Defendant Rogich also serves as a member of the Board's Audit Committee. According to the 2024 Proxy Statement, Defendant Rogich received $127,185 in total compensation from the Company.

20. Defendant Sherman has served as a Company director since 2017. Defendant Sherman also serves as Chair of the Board's Compensation Committee and as a member of both the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, in the 2024 fiscal year, Defendant Sherman received $164,243 in compensation from the Company.

21. Defendant Hariri served as a Company director from June 2020 until his resignation effective March 28, 2025. During his tenure on the Board, Defendant Hariri served as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, Defendant Hariri received $127,185 in total compensation from the Company.

22. Defendant Gorlin served as a Company director from June 2020 until his resignation effective July 25, 2024.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

23. By reason of their positions as officers, directors, and/or fiduciaries of BioVie and because of their ability to control the business and corporate affairs of BioVie, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

24. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on

truthful and accurate information.

25. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

26. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that BioVie complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct BioVie's affairs in an efficient, businesslike manner in order to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of BioVie at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how BioVie conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make

such disclosures as necessary to comply with federal and state securities laws;

(e) abstain from benefiting themselves to the detriment of BioVie;

(f) ensure that BioVie was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(g) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

27. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## CODE OF CONDUCT AND ETHICS

28. BioVie maintains a Code of Conduct and Ethics (the "Code of Conduct") that states that the purpose of the Code of Conduct is:

- To encourage honest and ethical conduct, including fair dealing and the ethical handling of conflicts of interest;
- To prompt full, fair, accurate, timely and understandable disclosure;
- To comply with applicable laws and governmental rules and regulations;
- To prompt internal reporting of violations of this Code;
- To protect the Company's legitimate business interests, including corporate opportunities, assets and confidential information; and
- To deter wrongdoing.

29. The Code of Conduct states that: "[a]ll directors, officers, employees and independent contractors of the Company are expected to be familiar with this Code and to adhere to the principles and procedures set forth in this Code."

30. In a section titled "Honest and Ethical Conduct", the Code of Conduct states that "[a]ll directors, officers, employees and independent contractors" have the following duties:

- To conduct business with professional courtesy and integrity, and act honestly and fairly without prejudice in all commercial dealings;
- To work in a safe, healthy and efficient manner, using skills, time and experience to the maximum of abilities;
- To comply with applicable awards, Company policies and job requirements, and adhere to a high standard of business ethics;
- To observe both the form and spirit of laws, governmental rules, regulations and accounting standards;
- Not to knowingly make any misleading statements to any person or to be a party to any improper practice in relation to dealings with or by the Company;
- To ensure that Company resources and properties are used properly;
- To maintain the confidentiality of information where required or consistent with Company policies; and
- Not to disclose information or documents relating to the Company or its business, other than as required by law, not to make any unauthorized public comment on Company affairs and not to misuse any information about the Company or its associates, and not to accept improper or undisclosed material personal benefits from third parties as a result of any transaction or transactions of the Company.

31. In a section titled "Conflicts of Interest", the Code of Conduct states that the following situations constitute impermissible conflicts of interest:

- To serve as a director, employee or contractor for a company that has a business relationship with, or is a competitor of the Company;
- To have a financial interest in a competitor, supplier or customer of the Company; To receive improper personal benefits from a competitor, supplier or customer, as a result of any transaction or transactions of the Company;
- To accept financial interest beyond entertainment or nominal gifts in the ordinary course of business, such as a meal or a coffee mug;

- To present at a conference where the conference sponsor has a real or potential business relationship with the Company (e.g. vendor, customer, or investor), and, the conference sponsor offers travel or accommodation arrangements or other benefits materially in excess of the Company's standard; or
- To use for personal gain, rather than for the benefit of the Company, an opportunity that you discovered through your role with the Company.

32. In a section titled "Disclosure", the Code of Conduct provides the following:

Each director, officer or employee, to the extent involved in the Company's disclosure process, including the Chief Executive Officer, Chief Operating Officer or Chief Financial Officer, or their equivalents, the (the "Senior Financial Officers"), is required to be familiar with the Company's disclosure controls and procedures applicable to him or her so that the Company's public reports and documents comply in all material respects with the applicable securities laws and rules. In addition, each such person having direct or supervisory authority regarding these securities filings or the Company's other public communications concerning its general business, results, financial condition and prospects should, to the extent appropriate within his or her area of responsibility, consult with other Company officers and employees and take other appropriate steps regarding these disclosures with the goal of making full, fair, accurate, timely and understandable disclosure.

Each director, officer or employee, to the extent involved in the Company's disclosure process, including the Senior Financial Officers, must:

- Familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company.
- Not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations.

33. In a section titled "Compliance", the Code of Conduct provides the following:

It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each employee, officer and director to adhere to the standards and restrictions imposed by those laws, rules and regulations in the performance of their duties for the Company, including those relating to accounting and auditing matters and insider trading.

The Board endeavors to ensure that the directors, officers and employees of the Company act with integrity and observe the highest standards of behavior and business ethics in relation to their corporate activities.

> Specifically, directors, officers and employees must:
>
> - Comply with the law;
> - Act in the best interests of the Company;
> - Be responsible and accountable for their actions; and
> - Observe the ethical principles of fairness, honesty and truthfulness, including disclosure of potential conflicts.
>
> Generally, it is against Company policies for any individual to profit from undisclosed information relating to the Company or any other company in violation of insider trading or other laws. Anyone who is aware of material nonpublic information relating to the Company, our customers, or other companies may not use the information to purchase or sell securities in violation of securities laws.

34. In a section titled "Fair Dealing" the Code of Conduct provides the following:

> Our core value of operating is based on responsiveness, openness, honesty and trust with our members, business partners, employees and shareholders. We do not seek competitive advantages through illegal or unethical business practices. Each employee, officer and director should endeavor to deal fairly with the Company's customers, service providers, suppliers, competitors and employees. No employee, officer or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

35. In a section titled "Protection and Proper Use of Company Assets", the Code of Conduct provides the following:

> All employees, officers and directors should protect the Company's assets and ensure their efficient use. All Company assets should be used only for legitimate business purposes. Theft, carelessness and waste have a direct impact on our profit.

## AUDIT COMMITTEE CHARTER

36. BioVie also maintains an Audit Committee Charter (the "Charter"), which sets forth the "responsibilities and powers of the Audit Committee of the Board of Directors." According to the Charter, the purpose of the Audit Committee is to represent and assist the Board in the oversight and monitoring of:

- The Company's accounting and financial reporting processes and the audits of the Company's financial statements;

- The integrity of the Company's financial statements;
- The Company's internal accounting and financial controls;
- and The Company's compliance with legal and regulatory requirements, and the independent auditors' qualifications, independence and performance.

37. In a section titled "Committee Authority and Responsibility", the Charter provides the following, in relevant part:

> The Audit Committee shall pre-approve (or, where permitted under the rules of the SEC, subsequently approve) engagements of the independent auditors to render audit services and/or establish pre-approval policies and procedures for such engagements, provided that (i) such policies and procedures are detailed as to the particular services rendered, (ii) the Audit Committee is informed of each such service and (iii) such policies and procedures do not include delegation to management of the Audit Committee's responsibilities under the Securities Exchange Act of 1934 or SEC rules. The Audit Committee shall also pre-approve any non-audit services proposed to be provided to the Company by the independent auditors.
>
> ***
>
> To the extent deemed necessary or appropriate, the Audit Committee shall be responsible for:
>
> *Oversight of the Company's Relationship with the Independent Auditor*
>
> - Review the independence of the independent auditors, including (i) obtaining on a periodic basis a formal written statement from the independent auditors delineating all relationships between the independent auditors and the Company, (ii) maintaining an active dialogue with the independent auditors, covering any disclosed relationship or services that may impair their objectivity and independence, (iii) presenting this statement to the Board and (iv) to the extent there are any such relationships, monitoring and investigating them and, if necessary, taking, or recommending to the Board that the Board take, appropriate action to maintain the independence of the independent auditors.
>
> ***
>
> *Financial Statements and Disclosure Matters*
>
> - Discuss and, as appropriate, review with management and the independent auditors the Company's financial statements and annual and quarterly reports, including the Company's disclosures under Management's Discussion and

Analysis of Financial Condition and Results of Operations, discuss with the independent auditors any other matters required to be discussed by accounting and auditing standards, and recommend to the Board whether the audited financial statements should be included in the Company's annual report.

- Discuss with management, the internal auditor and the independent auditors significant financial reporting issues raised and judgments made in connection with the preparation of the Company's financial statements, including the review of (i) major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles: (ii) analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues raised and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP or IFRS methods on the financial statements; (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet arrangements, on the Company's financial statements; and (iv) the type and presentation of information be included in earnings press releases, as well as any financial information and earnings guidance to be provided to analysts and rating agencies.

- At least annually, obtain and review a report by the independent auditor describing: (i) the audit firm's internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control review, or peer review, ofthe audit firm, or (iii) by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the audit firm, and any steps taken to deal with any such issues described in the report.

- Receive, review and discuss quarterly reports from the independent auditors on (i) the Company's major critical accounting policies and practices; (ii) significant alternative treatments of financial information within GAAP or IFRS that have been discussed with management; (iii) ramifications of the use of such alternative disclosures and treatments; (iv) any treatments preferred by the independent auditors; and (v) other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences.

- Review on a regular basis with the Company's independent auditors any problems or difficulties encountered by the independent auditors in the course of any audit work, including management's response with respect thereto, any restrictions on the scope of the independent auditors' activities or on access to requested information, and any significant disagreements with management; and ensure the resolution of any disagreements between management and the independent auditors regarding financial reporting.

- Review disclosures regarding the Company's internal controls that are required to be included in SEC reports.

- Discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

- Discuss with management earnings press releases and financial information and earnings guidance to be provided to analysts and rating agencies, including any proposed use of "pro forma" or "adjusted" non- GAAP and non-IFRS information.

*Oversight of the Company's Internal Control Function*

- Review the adequacy and effectiveness of the Company's internal control policies and procedures on a regular basis, including the responsibilities, budget and staffing of the Company's internal audit and control function, as well as the need for any special audit procedures in response to material control deficiencies, through inquiry and discussions with the Company's independent auditors and management.

- Review the reports prepared by management, assessing the adequacy and effectiveness of the Company's internal controls and procedures, prior to the inclusion of such reports in the Company's periodic filings as required under SEC rules.

*Compliance Oversight Responsibilities*

- Discuss and review guidelines and policies with respect to risk assessment and risk management, including the Company's insurance coverage from time to time.

- Discuss with the Company's chief legal officer legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

- Establish procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

- Review, approve and monitor the Company's code of ethics applicable to its senior financial officers.

- Review any conflicts of interest and related party transactions to assess an impact on the Company's internal controls or financial reporting and disclosure.

**SUBSTANTIVE ALLEGATIONS**

38. BioVie acquired NE3107, its lead drug candidate, from NeurMedix, Inc., an affiliated biopharmaceutical company, in June 2021.

39. On August 5, 2021, BioVie announced that it had enrolled the first patient into the NM101 "pivotal" Phase 3 clinical study testing NE3107 for the treatment of Alzheimer's Disease. In the context of FDA clinical trial procedure, the term "pivotal" refers to the particular study that the sponsor, or drug company, will primarily rely upon in its NDA for marketing approval from the FDA. The announcement further detailed that the Study "aims to have data readout by the end of 2022."

40. The Company described the Study as a randomized, double blind, placebo-controlled, US multicenter study of NE3107 in 316 subjects with mild to moderate Alzheimer's Disease. In addition to conventional cognition, memory, functional, behavioral and imaging end points, NM101 was intended to assess measures of glycemic control, brain glucose utilization and systems dysregulation.

41. As a sponsor organization, BioVie contracted with a third-party contract research organization ("CRO") to manage and monitor compliance at the clinical sites collecting data. Each clinical site was responsible for uploading its blinded data to an electronic database ("EDC") maintained by BioVie's CRO, the Cognitive Research Corporation.

42. On July 22, 2022, Cantor Fitzgerald released a report initiating coverage of BioVie with an "overweight" rating and $7 price target. Despite the report's commentary about NE3107's "potential blockbuster opportunity," Cantor Fitzgerald's analysts expressed caution about the company's development strategy that modulated projected probabilities of success. The report detailed that "BioVie has not conducted dose-ranging studies for its neuro programs. As such, we

view the 20mg twice a day dose being used in the ongoing studies as a bit of a 'dart throw,' and we remain uncertain as to whether this is an optimal dose." The report also expressed concern over the NM101 Study's screens in place to ensure it enrolls patients with neuroinflammation or insulin resistance and the shortened length of the study, concluding that "[a]lthough we applaud management's efforts to be capital-efficient, we are concerned that this is coming at a cost to scientific rigor."

43. By September 2022, BioVie had enrolled approximately 150 patients in the NM101 Study and was preparing for a data review by the Study's data safety monitoring board, or "DSMB," scheduled for late-2022.

44. On December 7, 2022, BioVie filed a current report on Form 8-K with the SEC announcing that it would forgo the interim DSMB analysis and instead increase enrollment to 400 patients, citing the fact that it had finished enrolling all 316 patients initially targeted before 50% of patients completed the study.

45. During the fall of 2022, however, concerns had begun to emerge about potential misconduct at one of NM101's principal study sites – Site No. 145 in Cutler Bay, Florida. By December 2022, Site No. 145 was under an "enrollment hold," meaning that the Study's principal investigator and/or BioVie had determined that potential misconduct necessitated a pause in registration of new patients. The concerns forced BioVie to undergo a "for-cause" audit. In the clinical-trial context, a for-cause audit is an investigation into a specific problem that has come to either the FDA's attention or the attention of the study's investigator or sponsor

46. Third-party auditor Pitts Quality Consulting conducted the audit at Site No. 145 on December 28 and 29, 2022 (the "Pitts Audit"). The Pitts Audit concluded that Site No. 145's level of compliance was unacceptable due in part to evidence of potential misconduct. For instance, Pitts auditors observed issues concerning protocol compliance, including that the eligibility of subjects in the NM101 Study could not be confirmed due to lack of data integrity of patient medical history records and that patient testing was not being administered uniformly

across patients due to different individuals rating patient responses using different languages. The Pitts Audit found additional protocol violations, including the enrollment of a site employee's family member without institutional review board approval and failure to translate the testing materials given to patients who required translations.

47. With respect to documentation issues, the Pitts Audit found data integrity issues and irregularities for several subject medical histories. Patient medical records appeared to be falsified so as to render patients "eligible" for the NM101 study when in fact they were not. Pitts further observed that text in the electronic medical records appeared to be inserted and dates for patient treatments appeared to be fake.

48. Pitts determined that Cognitive Research Corporation, the clinical research organization tasked with monitoring site compliance, was inadequate given that the above issues were not reported.

49. The Pitts Audit findings were presented at an audit closing meeting on December 29, 2022, which Site No. 145 Director Jose Marichal and NM101's Principal Investigator Dr. Carlos Martinez attended, along with clinical research coordinators and a research associate from BioVie's CRO. Pitts concluded that study eligibility could not be confirmed due to the lack of integrity in the medical records, and recommended that BioVie continue the enrollment hold and close the site due to the extent of noncompliance identified.

50. Despite the serious concerns and violations revealed during the Pitts Audit, the issues continued into and throughout much of 2023.

51. On August 8 and 9, 2023, independent auditor GeoSera, Inc., conducted a for-cause audit at Site No. 145 (the "GeoSera Audit") – the same site subject to the Pitts Audit eight months prior. At the time of the audit, enrollment at the site was completed.

52. GeoSera auditors made three "critical" observations, including that demographics and signature sections in MRI reports appeared to have been modified, that multiple MRI reports contained the same exact assessments for multiple patients, and that medical records contained

discrepancies in demographic information and dates. The GeoSera Audit also uncovered "major" observations concerning record-keeping procedures that violated standard practices, such as overwriting reports instead of adding supplemental reports, unsigned reports, inconsistent notes to files, and missing contemporaneous documentation for MRIs and other evaluations.

53. GeoSera recommended further investigation to determine the root cause of the missing data and/or inability to validate the data in the patient files in order to confirm whether the patients were eligible for the final data analysis for the NM101 Study. The GeoSera Audit further concluded that the clinical research organization should have halted the study at this site but did not do so despite more than a dozen multiple-day monitoring visits.

54. On August 31, 2022, BioVie entered into a sales agreement with Cantor Fitzgerald and B. Riley Securities pursuant to which the Company could sell shares into the open market.

55. Between December 21, 2022 and April 3, 2023, BioVie sold an additional 3.6 million shares to public investors, raising an $19.8 million.

56. At no point during its at-the-market offerings did the Company disclose the protocol violations and data falsification findings from the Pitts Audit to the public.

***Materially False and Misleading Statements Issued During the Relevant Period***

57. On February 10, 2023, BioVie filed its quarterly report on Form 10-Q with the SEC for the period ended December 31, 2022 (the "2Q23 10-Q"). Defendant Do signed the 2Q23 10-Q on behalf of the Company. With respect to the NM101 study's enrollment and targets for completion, the 2Q23 10-Q stated the following, in relevant part:

> In neurodegenerative disease, the Company acquired the biopharmaceutical assets of NeurMedix, Inc. ("NeurMedix"), a privately held clinical-stage pharmaceutical company, in June 2021 (See Note 5 Related Party Transactions). The acquired assets included NE3107, a potentially selective inhibitor of inflammatory extracellular single-regulated kinase ("ERK") signaling that, based on animal studies, is believed to reduce neuroinflammation. NE3107 is a novel orally administered small molecule that is thought to inhibit inflammation-driven insulin resistance and major pathological inflammatory cascades with a novel mechanism of action. There is emerging scientific consensus that both inflammation and

> insulin resistance may play fundamental roles in the development of Alzheimer's Disease (AD) and Parkinson's Disease (PD), and NE3107 could, if approved, represent an entirely new medical approach to treating these devastating conditions affecting an estimated 6 million Americans suffering from AD and 1 million Americans suffering from PD. In August 2021, the Company initiated the FDA authorized potentially pivotal Phase 3 randomized, double-blind, placebo-controlled, parallel group, multicenter study to evaluate NE3107 in subjects who have mild to moderate Alzheimer's disease (NCT04669028). The Company is targeting primary completion of this study in the third quarter of calendar year 2023.
>
> ***
>
> The increase in research and development expenses of $1.3 million was primarily due to the Neuroscience NE3107 studies, which were significantly more active during the three months ended December 31, 2022 compared to the three months ended December 31, 2021. The Parkinson's Phase 2 study initiated in January 2022, became fully enrolled with the top-line data read reported in December 2022 and the Alzheimer Phase 3 study is approaching full enrollment. Our Orphan drug candidate BIV201's Phase 2b study, which was initiated in June 2021, accounted for approximately $100,000 of the net increase in research and development expenses for three months ended December 31, 2022.

58. With respect to risks arising from the protocol and compliance violations in the NM101 study, the 2Q23 10-Q stated the following, in relevant part:

> We depend, and will continue to depend, on contract research organizations ("CROs"), clinical trial sites and clinical trial principal investigators, contract laboratories, and other third parties to conduct our clinical trials. We rely heavily on these third parties over the course of our clinical trials, and we control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our studies is conducted in accordance with the protocol and applicable legal, regulatory, and scientific standards and regulations, and our reliance on third parties does not relieve us of our regulatory responsibilities. We and these third parties are required to comply with current good clinical practices ("cGCPs"), which are regulations and guidelines enforced by the FDA and comparable foreign regulatory authorities for the conduct of clinical trials on product candidates in clinical development. Regulatory authorities enforce cGCPs through periodic inspections and for-cause inspections of clinical trial principal investigators and trial sites. If we or any of these third parties fail to comply with applicable cGCPsor fail to enroll a sufficient number of patients, we may be required to conduct additional clinical trials to support our marketing applications, which would delaythe regulatory approval process. Moreover, our business may be implicated if any of these third parties violates federal, state, or foreign fraud

and abuse or false claims laws and regulations or healthcare privacy and security laws, or provide us or government agencies with inaccurate, misleading, or incomplete data.

Although we design the clinical trials for our product candidates, our CROs will facilitate and monitor our clinical trials. As a result, many important aspects of our clinical development programs, including site and investigator selection, and the conduct and timing and monitoring of the study, will be partly or completely outside our direct control. Our reliance on third parties to conduct clinical trials will also result in less direct control over the collection, management, and quality of data developed through clinical trials than would be the case if we were relying entirely upon our own employees. Communicating with third parties can also be challenging, potentially leading to mistakes as well as difficulties in coordinating activities.

Any third parties conducting our clinical trials are not, and will not be, our employees and, except for remedies available to us under our agreements with these third parties, we cannot control whether they devote sufficient time and resources to our ongoing preclinical, clinical, and nonclinical programs. These third parties may also have relationships with other commercial entities, including our competitors, for whom they may also be conducting clinical trials or other drug development activities, which could affect their performance on our behalf. If these third parties do not successfully carry out their contractual duties or obligations or meet expected deadlines, if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols or regulator requirements, or if there are other difficulties with such third parties, such as staffing difficulties, changes in priorities, or financial distress, our clinical trials may be extended, delayed, or terminated. As a result, we may not be able to complete development of, obtain regulatory approval of, or successfully commercialize our product candidates. As a result, our financial results and the commercial prospects for our product candidates will be harmed, our costs could increase, and our ability to generate revenue could be delayed.

If any of our relationships with trial sites, or any CRO that we may use in the future, terminates, we may not be able to timely enter into arrangements with alternative trial sites or CROs, or do so on commercially reasonable terms. Switching or adding clinical trial sites or CROs to conduct our clinical trials involves substantial cost and requires extensive management time, training, and focus. In addition, there is a natural transition lag when a new third party must learn about our product candidates and protocols, which can result in delays that may materially impact our ability to meet our desired clinical development timelines.

59. On March 2, 2023, the Company published a press release titled "BioVie Announces Completion of Patient Enrollment in Phase 3 Trial Assessing NE3107 in Alzheimer's 23 Disease." The press release stated the following, in relevant part:

> [BioVie], a clinical-stage company developing innovative drug therapies for the treatment of neurological and neurodegenerative disorders and advanced liver disease, today announced that its NM101 trial evaluating NE3107 in the treatment of patients with Alzheimer's Disease, has achieved its revised enrollment target of 400 patients. The Company anticipates announcing top line results from the study in October 2023. The NM101 trial is a potentially pivotal Phase 3 randomized, double blind, placebo controlled, parallel group, multicenter study to evaluate NE3107 in patients who have mild to moderate Alzheimer's disease (NCT04669028). The study has co-primary endpoints looking at cognition using the Alzheimer's Disease Assessment Scale-Cognitive Scale (ADAS-Cog 12) and function using the Alzheimer's Disease Cooperative Study-Clinical Global Impression of Change (ADCS-CGIC).
>
> The NM101 trial protocol originally specified enrolling at least 316 patients equally randomized to treatment and placebo arms. The protocol also pre-specified the potential for a review by the data safety monitoring board (DSMB), in a manner that is blinded to the Company, when roughly 50% of the 316 enrolled patients have completed the study to determine if increasing enrollment of up to 400 patients might be desirable for the purpose of enhancing the probability of achieving statistical significance. Due to an accelerating pace of enrollment as the trial progressed, the Company enrolled 316 patients before 50% of enrolled patients had completed the study. Consequently, the Company decided to proceed to 400 patients without the pre-specified interim analysis.
>
> "We look forward to having topline data from this trial in October," said Cuong Do, BioVie's President and CEO. "We are optimistic that this trial will provide similar data to what was seen in the Phase 2 exploratory study, which showed that patients treated with NE3107 experienced enhanced cognition as measured by multiple assessment tools, including a 2.1 points improvement on the modified ADAS-Cog12 scale."

60. On March 23, 2023, the Company filed a current report on Form 8-K with the SEC (the "March 2023 8-K"). The March 2023 8-K attached an investor presentation, which provided, *inter alia*, the following information with respect to the enrollment status and progress of the NM101 Study in terms of its target completion date:




61. In an investor presentation slide attached to the March 2023 8-K, the Company provided detailed information on the NM101 Study's data without disclosing the critical problems associated with it, including the fact that it included fraudulent patient data. Indeed, the investor presentation represented the following, in relevant part:




62. On May 12, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended March 31, 2023 (the "Q3 2023 10-Q"), which was signed by Defendant Do on behalf of the Company. With respect to the Study's enrollment and targets for completion, the Q3 2023 10-Q stated the following, in relevant part:

> The Company acquired the biopharmaceutical assets of NeurMedix, Inc. ("NeurMedix"), a privately held clinical-stage pharmaceutical company, in June 2021 (See Note 5 Related Party Transactions). The acquired assets included NE3107, a potentially selective inhibitor of inflammatory extracellular single-regulated kinase("ERK") signaling that, based on animal studies, is believed to reduce neuroinflammation. NE3107 is a novel orally administered small molecule that is thought to inhibit inflammation-driven insulin resistance and major pathological inflammatory cascades with a novel mechanism of action. There is emerging scientific consensus that both inflammation and insulin resistance may play fundamental roles in the development of Alzheimer's Disease (AD) and Parkinson's Disease (PD), and NE3107 could, if approved represent an entirely new medical approach to treating these devastating conditions affecting an estimated 6 million Americans suffering from AD and 1 million Americans suffering from PD. In August 2021, the Company initiated the FDA authorized potentially pivotal Phase 3 randomized, double-blind, placebo-controlled, parallel group, multicenter study to evaluate NE3107 in subjects who have mild to moderate AD (NCT04669028). The Company is targeting primary completion of this study in the fourth quarter of calendar year 2023.
>
> The increase in research and development expenses of approximately $6.7 million was primarily due to the Neuroscience NE3107 studies, which were significantly

> more active during the three months ended March 31, 2023, compared to the three months ended March 31, 2022. The Parkinson's Phase 2 study initiated in January 2022 reported top results and the Alzheimer Phase 3 study reached full enrollment. Our Orphan drug candidate BIV201's Phase 2b study, which was initiated in June 2021, accounted for approximately $124,000 of the net increase in research and development expenses for three months ended March 31, 2023.

63. On July 18, 2023, the Company published a letter to its shareholders. The letter was written by Defendant Do and stated the following, in relevant part:

> Dear Shareholders,
>
> The company has made tremendous progress since I last wrote you in December, and the totality of the data we have shared lead me to be increasingly excited and optimistic about what we hope to see when our Phase 3 trial for NE3107 in Alzheimer's Disease (AD) reads out later this year. I have prepared this letter to shareholders to provide an update that synthesizes all the information that we have released and presented at recent medical conferences.
>
> Our NM101 trial has been fully enrolled since February 2023 and is nearing its completion by the end of September. Topline data readout is expected in the October-November timeframe.
>
> As we approach data readout, I am increasingly optimistic about what we hope to see based on the totality of the data that we have disclosed. The data described above is suggestive that NE3107 may have an active epigenetic effect associated with improvements in inflammation, insulin signaling, and other critical biological processes in a manner that is significantly correlated to improvements in cognition, AD biomarkers, and imaging endpoints. This small exploratory trial involving just patients provided statistically significant data on so many measures and correlations. Assuming that epigenic changes seen in the Phase 2 trial is coming from NE3107 activity and not some placebo or random effect, one would expect the 200 patients treated with NE3107 in the NM101 trial should have dramatically different results from the 200 patients in the placebo arm on these same measures. Additionally, the data we recently presented at the 83rd Scientific Sessions of the American Diabetes Association that took place June 23-26 give[s] further support for what we can expect. This poster presentation did not provide any results or readouts. Instead, it provided the first data on the 400 patients in the NM101 trial as they started the trial (i.e., at baseline), including:
>
> — The large majority of patients had elevated inflammatory markers and were overweight. Large portions have some degree of metabolic dysregulation, including hypertension (61%), impaired glucose metabolism (52%), insulin resistance (47%), hypertriglyceridemia (40%) and hypercholesterolemia (30%).

- Patients who are amyloid beta positive (Aβ+) had comparable CDR-SB scores at baseline as those who are Aβ negative (Aβ-). This supports our thesis all along that Aβ cannot be the only factor driving AD or cognitive decline.
- Aβ+ patients had worse ADAS-Cog12 and MMSE scores (indicating lower cognitive functioning) than the Aβ- patients, while the Aβ- patients had significantly higher inflammation, insulin resistance, IFG, and hypertension, compared to their Aβ+ counterparts. We interpret this data to mean that metabolic factors are critical drivers of cognitive decline for everyone, and that the presence of Aβ is a contributory – but not a causal – factor for the cognitive decline. Patients treated with NE3107 in prior trials have seen improvements in inflammation, glucose metabolism, insulin resistance, hypercholesterolemia, hypertriglyceridemia, etc. We believe the fact that patients started the trial with elevated levels of these factors provides additional cautious optimism for the NM101 trial as NE3107 has demonstrated a potential impact on these areas in previous studies.

64. On August 16, 2023, the Company filed its annual report on Form 10-K for the 2023 Fiscal Year (the "2023 Form 10-K"). The 2023 Form 10-K was signed by Defendants Do, Lang, Sherman, Berman, Gorlin, Hariri, and Rogich and contained certification signed by Defendant Do pursuant to the Sarbanes-Oxley Act of 2002 attesting to its accuracy. With respect to the Study's enrollment and targets for completion, the 2023 Form 10-K stated the following, in relevant part:

> In neurodegenerative disease, the Company's drug candidate NE3107 inhibits inflammatory activation of extracellular single-regulated kinase ("ERK") and Nuclear factor kappa-light-chain-enhancer of activated B cells ("NFkB") (e.g., tumor necrosis factor ("TNF") signaling) that leads to neuroinflammation and insulin resistance, but not their homeostatic functions (e.g., insulin signaling and neuron growth and survival). Both inflammation and insulin resistance are drivers of Alzheimer's disease ("AD") and Parkinson's disease ("PD").
>
> The Company is conducting a potentially pivotal Phase 3 randomized, double-blind, placebo-controlled, parallel-group, multicenter study to evaluate NE3107 in patients who have mild to moderate Alzheimer's disease (NCT04669028). The Company is targeting primary completion of this study in the fourth quarter of calendar year 2023.
>
> ***
>
> The Company is conducting a potentially pivotal Phase 3 randomized, double blind, placebo controlled, parallel group, multicenter study to evaluate NE3107 in

> patients who have mild to moderate AD (NCT04669028). The study has co-primary endpoints looking at cognition using the Alzheimer's Disease Assessment Scale-Cognitive Scale (ADAS-Cog 12) and function using the Alzheimer's Disease Cooperative Study-Clinical Global Impression of Change (ADCS-CGIC). The program is fully enrolled and is targeting primary completion in the fourth quarter of the calendar 2023 year.

65. The 2023 Form 10-K also represented the following, in relevant part, with respect to the Company's compliance with regulations pertaining to clinical trials:

> In the United States, the FDA regulates drugs under the Federal Food, Drug and Cosmetic Act, or FDCA, and implements regulations. Drugs are also subject to other federal, state and local statutes and regulations. Biologics are subject to regulation by the FDA under the FDCA, the Public Health Service Act, or the PHSA, and related regulations, and other federal, state and local statutes and regulations. Biological products include, among other things, viruses, therapeutic serums, vaccines and most protein products. The process of obtaining regulatory approvals and the subsequent compliance with appropriate federal, state, local and foreign statutes and regulations require the expenditure of substantial time and financial resources. Failure to comply with the applicable United States requirements at any time during the product development process, approval process or after approval, may subject an applicant to administrative or judicial sanctions. FDA sanctions could include refusal to approve pending applications, withdrawal of an approval, a clinical hold, warning letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, refusals of government contracts, restitution, disgorgement or civil or criminal penalties. Any agency or judicial enforcement action could have a material adverse effect on us.
>
> The process required by the FDA before a drug or biological product may be marketed in the United States generally involves the following: . . . Performance of adequate and well-controlled human clinical trials according to the FDA's current good clinical practices, or GCPs, to establish the safety and efficacy of the proposed drug or biologic for its intended use . . . .
>
> Clinical trials involve the administration of the drug or biological candidate to healthy volunteers or patients having the disease being studied under the supervision of qualified investigators, generally physicians not employed by or under the trial sponsor's control. Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, dosing procedures, subject selection and exclusion criteria, and the parameters to be used to monitor subject safety. Each protocol must be submitted to the FDA as part of the IND. Clinical trials must be conducted in accordance with the FDA's good clinical practices requirements. Further, each clinical trial must be reviewed and

> approved by an independent institutional review board, or IRB, at or servicing each institution at which the clinical trial will be conducted. An IRB is charged with protecting the welfare and rights of trial participants and considers such items as whether the risks to individuals participating in the clinical trials are minimized and are reasonable in relation to anticipated benefits. The IRB also approves the informed consent form that must be provided to each clinical trial subject or his or her legal representative and must monitor the clinical trial until it is completed.

66. With respect to any risks associated with the protocol and compliance violations in the NM101 Study, the 2023 Form 10-K stated the following, in relevant part:

> We depend, and will continue to depend, on contract research organizations ("CROs"), clinical trial sites and clinical trial principal investigators, contract laboratories, and other third parties to conduct our clinical trials. We rely heavily on these third parties over the course of our clinical trials, and we control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our studies is conducted in accordance with the protocol and applicable legal, does not relieve us of our regulatory responsibilities. We and these third parties are required to comply with current good clinical practices ("cGCPs"), which are regulations and guidelines enforced by the FDA and comparable foreign regulatory authorities for the conduct of clinical trials on product candidates in clinical development. Regulatory authorities enforce cGCPs through periodic inspections and for-cause inspections of clinical trial principal investigators and trial sites. If we or any of these third parties fail to comply with applicable cGCPs or fail to enroll a sufficient number of patients, we may be required to conduct additional clinical trials to support our marketing applications, which would delay the regulatory approval process. Moreover, our business may be implicated if any of these third parties violates federal, state, or foreign fraud and abuse or false claims laws and regulations or healthcare privacy and security laws, or provide us or government agencies with inaccurate, misleading, or incomplete data.
>
> Although we design the clinical trials for our product candidates, our CROs will facilitate and monitor our clinical trials. As a result, many important aspects of our clinical development programs, including site and investigator selection, and the conduct and timing and monitoring of the study, will be partly or completely outside our direct control. Our reliance on third parties to conduct clinical trials will also result in less direct control over the collection, management, and quality of data developed through clinical trials than would be the case if we were relying entirely upon our own employees. Communicating with third parties can also be challenging, potentially leading to mistakes as well as difficulties in coordinating activities.

> Any third parties conducting our clinical trials are not, and will not be, our employees and, except for remedies available to us under our agreements with these third parties, we cannot control whether they devote sufficient time and resources to our ongoing preclinical, clinical, and nonclinical programs. These third parties may also have relationships with other commercial entities, including our competitors, for whom they may also be conducting clinical trials or other drug development activities, which could affect their performance on our behalf. If these third parties do not successfully carry out their contractual duties or obligations or meet expected deadlines, if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols or regulatory requirements, or if there are other difficulties with such third parties, such as staffing difficulties, changes in priorities, or financial distress, our clinical trials may be extended, delayed, or terminated. As a result, we may not be able to complete development of, obtain regulatory approval of, or successfully commercialize our product candidates. As a result, our financial results and the commercial prospects for our product candidates will be harmed, our costs could increase, and our ability to generate revenue could be delayed.
>
> If any of our relationships with trial sites, or any CRO that we may use in the future, terminates, we may not be able to timely enter into arrangements with alternative trial sites or CROs, or do so on commercially reasonable terms. Switching or adding clinical trial sites or CROs to conduct our clinical trials involves substantial cost and requires extensive management time, training, and focus. In addition, there is a natural transition lag when a new third party must learn about our product candidates and protocols, which can result in delays that may materially impact our ability to meet our desired clinical development timelines.

67. The 2023 Form 10-K also represented the following with respect to clinical trials:

> The process of obtaining FDA approval is costly and time consuming. Current FDA requirements for a new human drug or biological product to be marketed in the United States include, among other things: (a) the successful conclusion of pre-clinical laboratory and animal tests, if appropriate, to gain preliminary information on the product's safety; (b) filing with the FDA of an IND application to conduct human clinical trials for drugs or biologics; (c) the successful completion of adequate and well-controlled human clinical investigations to establish the safety and efficacy of the product for its recommended use; and (d) filing by a company and acceptance and approval by the FDA of a NDA for a drug product or a BLA for a biological product to allow commercial distribution of the drug or biologic. A delay in one or more of the procedural steps outlined above could be harmful to us in terms of getting our product candidates through clinical testing and to market, which could have a materially adverse effect on our business. . . .

> Even if we are successful in developing BIV201 and NE3107, our product candidates, we have limited experience in conducting or supervising clinical trials that must be performed to obtain data to submit in concert with applications for approval by the FDA. The regulatory process to obtain approval for drugs for commercial sale involves numerous steps. Drugs are subjected to clinical trials that allow development of case studies to examine safety, efficacy, and other issues to ensure that sale of drugs meets the requirements set forth by various governmental agencies, including the FDA. In the event that our protocols do not meet standards set forth by the FDA, or that our data is not sufficient to allow such trials to validate our drugs in the face of such examination, we might not be able to meet the requirements that allow our drugs to be approved for sale which could have a materially adverse effect on our business.

68. On October 25, 2023, the Company published a press release disclosing the data presented from the NM101 Phase 3 clinical trial. The press release stated the following, in relevant part:

> [BioVie], a clinical-stage company developing innovative drug therapies for the treatment of advanced liver disease and neurological and neurodegenerative disorders, announced that blinded data on cognitive, biomarker and imaging findings from the recently completed Phase 3 clinical trial (NCT04669028) of NE3107 in the treatment of mild to moderate Alzheimer's Disease (AD) were presented today as an oral presentation at the 16th Clinical Trials on Alzheimer's Disease (CTAD) in Boston, MA.
>
> The presentation, Clinical Outcomes from a Phase 3, Randomized, Placebo-Controlled Trial of NE3107 in Subjects with Mild to Moderate Probable Alzheimer's Disease, detailed a cross sectional analysis of blinded data from BioVie's Phase 3 study and discussed participants whose data were available for analysis as of October 18, 2023 (n=322). These preliminary analyses will be updated once the complete and final dataset becomes available and when the study database is locked, unblinded and analyzed in full.
>
> The blinded data presented suggest that NE3107 is a biologically active compound exerting potential effects as observed by biomarker, imaging, cognitive and functional assessments. Population changes from baseline were observed, with some patients demonstrating an improvement after 30 weeks of treatment with the double blinded oral study drug (NE3107 or matched placebo) as compared to baseline, while many were also observed to have worsened, which is consistent with the natural progression of the disease (Figure 1).
>
> "The blinded data presented at CTAD show encouraging changes from baseline that would not typically be seen without a treatment effect, which provides us with confidence that NE3107 may show a clear benefit over placebo when the data from

> this trial is unblinded in the coming weeks," commented Joseph Palumbo, BioVie's Chief Medical Officer. "We believe NE3107 has the potential become to effective multi-mechanistic treatment for Alzheimer's that is safe and can be orally administered."
>
> The last patient came in for the last treatment visit in late September 2023, and the Company is currently resolving outstanding database queries and preparing for database freeze and data unblinding. The Company expects to announce unblinded, topline data from this trial in the November/December timeframe.

69. On November 1, 2023, BioVie hosted a conference call with analysts and investors to discuss the Study. During his opening remarks, Defendant Do stated the following, in relevant part:

> So we presented the data that we had as of October 18 from roughly 322 subjects, whose data were verified or in the process of being verified and cleaned as of this date.
>
> ***
>
> And in looking at the totality of the data, we conclude that any NE3107 appears to be biologically active and that it appears to be having an impact on the cognitive biomarkers and end-to-end points that we've looked at in the trial.
>
> ***
>
> And as we look at this pattern, we see great -- we have some optimism that there is an effect, a drug effect going on. We need to make that comment because if there were not a drug effect, you would expect all the subjects to be clumped together. And that would be roughly around the no-change line or it's somewhat worsening, somewhat getting better if there's a learning or a placebo effect.
>
> But the fact that we see a pattern of maybe people getting better and many people getting worse, which suggests to us that there is something going on beyond just a group, the drug that not working. You would not see a lot of people getting a lot better if there is not something going on here, right? And the magnitude of the clinical getting better from this blinded data is a little too large from what you would expect from just a placebo effect.

70. Also during the call, Defendant Palumbo stated the following, in relevant part:

> So [the results tell] us that we've captured the right individuals for this study. It shows that in the course of only six months, who started out as negative shift, towards positive, it gives us a good look at the sensitivity of this study. And that -- and remember, half of these folks are on drug and half are on placebo. So for me, this is a signal I was looking for in the midst of COVID, in the midst of everything

> else. Did we capture the right patients and would they progress as expected, right? And you wouldn't necessarily see this in a study that was only looking at positive patients at baseline. Now the data and positivity is great, of course, that we have people who shift towards this negative status, and that is absolutely exciting.
>
> Also, this validation study is long enough, at least to me, in looking at the shift from negative to positive in a six-month basis of the study. And so I'm actually very happy with that. And that was all I really wanted to say, Cuong.

71. During a question-and-answer portion of the call, Defendant Do stated:

> So with that, I know that we have over time here, let me close the call by saying that we are cautiously optimistic when looking at the totality of the data, right? And I do not believe you can look at any one particular measure to say things are working or not working, you have to look at the totality of the data. And the totality of the data here would suggest that NE3107 appears to have an underlying biological effect and that biological effect appears to be having an impact on the cognitive, functional, biomarker and imaging endpoints that we are looking at in this trial.
>
> So we are cautiously optimistic that when we unblind the data after Thanksgiving or early December, that this could potentially lead to a significant improvement, a significant new tool for the community to treat Alzheimer's disease when it's fully registered.

72. The statements detailed above were materially false and misleading when made, and omitted material facts. Specifically, statements describing NE3107 and the Study as "fully enrolled" failed to explain that findings from the Pitts Audit and later GeoSera Audit gave reason to doubt that the patients enrolled in that site should have been included in the Study at all. In reality, the Study was not "approaching full enrollment" pursuant to the Study's protocol. As would later be revealed, BioVie enrolled a material number of patients that should not have been enrolled, thereby contradicting the publicly-stated number of enrolled patients and/or status of patient enrollment in the NM101 Study. Additionally, the Pitts and GeoSera Audits confirmed that patients enrolled in the trial did not meet the eligibility criteria under the study protocol and/or patient data failed to confirm their eligibility for the Study.

73. Individual Defendants' statements and omissions concerning the expected timeline for data collection and release of topline Study data were also materially false and misleading when made and omitted material facts. Specifically, the statements concerning timelines created the materially false impression that the NM101 Study was proceeding properly and in accordance with protocol. Rather, the Individual Defendants concealed the delays that would inevitably be caused by the patient fraud and data integrity issues revealed by the Pitts and GeoSera Audits. Once the fraudulent data and/or ineligible patients were removed from the trial, the NM101 Study would not be sufficiently "powered" pursuant to the Study's protocol. This, in turn, would require additional enrollment or starting the trial anew.

74. Further, the Individual Defendants conveyed objective conclusions about blinded data that were materially false and misleading when made and omitted material facts. Throughout the Relevant Period, the Individual Defendants discussed NM101's data in detail without disclosing its integrity problems, including the fact that fraudulent patient data was likely included in the Study. For instance, while "baseline data" may have showed "evidence of metabolic inflammation" in certain subjects, BioVie concealed that a material number of patients in the NM101 Study data were either ineligible for the Study in the first instance or did not have proper underlying data to confirm their eligibility. As a result, Individual Defendants' descriptions of the Study data materially misled investors concerning the strength of the data and/or its ability to sustain the NM101 study at the "power" level required by the study protocol.

***The Truth Emerges***

75. On November 8, 2023, BioVie filed the Q1 2024 10-Q with the SEC. The Q1 2024 10-Q disclosed, in relevant part:

> [D]uring routine monitoring of blinded data from our Phase 3 study (NCT04669028) of NE3107, we uncovered what appears to be potential scientific misconduct and significant non-compliance with GCPs and regulation at six sites. We have alerted the FDA's Office of Scientific Integrity ("OSI") about these issues and believe OSI will perform a thorough, competent, objective and fair

> research of any potential scientific misconduct and non-compliance of GCPs and regulation.
>
> Sensitivity analysis excluding data from these six problematic sites has been performed and accounted for in the statistical analysis plan for the study (NCT04669028). Nonetheless, these findings of potential scientific misconduct and significant GCP violations may call into question the rigor, robustness and validity of the entire data set for this study (NCT04669028) and may require additional clinical studies to confirm the final results of the study.

76. On November 9, 2023, the price of BioVie stock fell to a low of $2.31 per share, down from its closing price of $4.26 the day before.

77. On November 29, 2023, BioVie filed a current report on Form 8-K (the November 2023 8-K") attaching a copy of a press release and an investor presentation. The press release stated, in relevant part:

> The trial started during the COVID-19 pandemic when access to clinical sites was limited and enrolled a total of 439 patients through 39 sites. Upon trial completion, the Company found significant deviation from protocol and Good Clinical Practice (GCP) violations at 15 sites (virtually all of which were from one geographic area). This highly unusual level of suspected improprieties led the Company to exclude all patients from these sites and to refer them to the U.S. Food and Drug Administration (FDA) Office of Scientific Investigations (OSI) for further action. After these exclusions, 81 patients remained in our Modified Intent to Treat (MITT) population, 57 of whom were in the Per-Protocol population which included those who completed the trial and were verified to take study drug from pharmacokinetic (PK) data.

78. The investor presentation provided further information about the "significant deviation from protocol" mentioned in the press release, specifically:

- The Company monitors blinded data to track safety and ensure timely data entry into the EDC
- The company started noticing unusual data patterns when enough patients completed the trial. Pentara (a leading AD biostatistics firm) reviewed the blinded data and found:
    - Several sites had anomalous data (e.g. inconsistent patterns compared to historical data, large proportions of patients improving compared to baseline, unusual variability patterns)
    - All patients in a particular demographic group enrolled in this trial showed

a data pattern not explainable based on disease progression and which substantially deviated from historical data far this demographic in other AD trials

  - Without unblinding and PK data, there was no way to identify the cause. Clear subgroup analyses identified: anomalous sites vs. other sites; identified demographic group vs. all others

- In parallel, BioVie had the first opportunity to start the data review process as sites started to finish patient-facing activities in early summer 2023
  - Noticed deviations from expectations (e.g. data patterns, missing data, copied/pasted MRI results, etc.)

***

- CROs identified six sites with numerous and significant procedural deviations, which led us to:
  - Updated SAP to 1) exclude all patients from affected sites; and 2) pre-specify a series of subgroup analyses
  - Amended our protocol: 1) Finalize CDR-SB and ADAS-Cog12 as primary endpoints based on prior FDA communications; 2) Created "adaptive trial" design
  - Reported the 6 sites to the FDA's Office of Scientific Investigations
- As data was unblinded, anomalous data from the identified demographic group was confirmed to be scientifically improbable. Furthermore, all patients in this demographic were associated with the previously identified anomalous sites, and virtually all of which were concentrated in a single geographic area. Accordingly, these sites were also excluded per our SAP and additionally referred to the FDA.

79. Additionally, the investor presentation noted that "Unanticipated exclusion of sites due to deviations led to study being underpowered. Adaptive feature of trial allows the Company to continue enrolling patients to reach statistical significance."

80. Also on November 29, 2023, BioVie hosted a conference call which was led by Defendants Do and Palumbo, as well as the CEO of Pentara Corporation. During the call, Defendant Do noted that the NM101 Study "did not achieve statistical significance because we had to exclude so many patients from the trials that we believe engaged in improper practices." He further noted that BioVie had to exclude 358 patients, which represented "over 80% of our

enrolled populations due to suspected improper conduct at 15 clinical sites," and that "all of these clinical sites had been referred to the FDA."

81. Additionally, Defendant Do admitted that what the Company had found at the impacted clinical sites was "so unusual." Do further stated that each site was responsible for uploading data to an electronic database known as the "EDC" for its patients, that the EDC is maintained by the CRO, and that BioVie only had read access to the blinded data. Do noted that the Company "monitors blinded data on an ongoing basis to review safety and ensure that data is entered on a timely basis into the EDC."

82. With respect to six of the clinical sites excluded from the Study, Defendant Do stated:

> In parallel, patient facing activities started to wrap up at some of the sites in July of 2023, which provided us the first opportunity to conduct a detailed data review and validation….that is when we started to notice higher than expected levels of deviations….that is when we made the decision to undertake a multi-step review process that involved hiring a supplemental CRO to conduct quality control visits to all sites and then to conduct source data verification or SDV on 100 percent of the materials touched in the clinical sites. Subsequently, a third CRO was hired to audit sites as well. We took this level of proactive actions and diligence that goes way above what is typically done by pharma companies because we understood the importance of this data. We finally received the final QC reports from the supplemental CRO on November 6th, which revealed that six sites that enrolled 128 patients had what appeared to be numerous and significant GCP violations and deviations from our protocol. The deviations were to such an extent that we had to act.
>
> ***
>
> [W]hen we saw this problem we acted rapidly and vigorously, rather than ignore it because we could not condone the practices we uncovered, such as when multiple patients came in for an MRI scan on the same day they ended up having the same result posted with their records…as a result we did the following: first we updated our statistical analysis plan or SAP to exclude all data from these six deviating sites because the patients and their data were totally suspect. Second, we amended our protocol with the FDA to do two things – first is that we finalize the primary endpoints to be CDR-SB and ADAS-Cog. This was a planned activity as a result of our interaction with the FDA over months…the second thing is that we revised the clinical trial design itself to be an adaptive design so that we may work

with the FDA to potentially continue enrolling additional patients if we see an efficacy signal but miss on stats due to the excluded sites. And the third thing we did was referred all six sites to the FDA's Office of Scientific Investigations three days after receiving the CRO's report…. on November the 9th.

83. With respect to the other nine sites that were excluded, Defendant Do explained:

When we started unblinding the data, we focused first on the sub-group analyses that Pantera recommended, right, and we found that the anomalous data from the patients from the identified demographic groups could not be explained scientifically. The placebo patients are not expected to significantly and dramatically improve as we saw in the data from this demographic group. The same thing was found regarding the anomalous sites. And, in fact, the problem identified with the demographic group and the anomalous sites turned out to be one and of the same in that virtually all patients from the demographic group were associated with the anomalous sites, which were all located in one geographic area. Thus, we had to exclude these nine sites that enrolled a total of 230 patients as well per our pre-specified SAP. Since virtually all of the now 15 sites suspected of improprieties were in a single geographic area, we suspect that there may be more going on; thus, we referred all 15 sites to the FDA. And since we have a deep respect for the FDA and their investigative processes we are not identifying the geographic area and sites and we have not notified any of the sites as to their status… by excluding 358 patients or over 80% of our enrollment we were left with 81 patients in our modified intent to treat population. This also meant that we only had 57 in the per protocol populations, which are patients who have completed the trial, patients who we can verify have taken the study drug through PK, and so forth.

84. Defendant Do went on to add:

So the natural question is how could this have happened? That is a great question and I wish I had a simple, great answer for you. But, I believe there are a few confounding factors that got us here. First, we started enrolling the trial at the height of the COVID-19 pandemic, where there was limited access to the sites. In fact, the limited access remained the case for most of the duration of the trial. We rely on third-parties to execute and monitor the trials so one could say the on the ground oversight of the sights [sic] was not what it needed to be. Second, we assumed good intent. There are nearly 500,000 clinical sites registered in clinicaltrials.gov, all of whom are licensed. They have to adhere to GCP, and they are periodically audited by the FDA and other agencies. We presumed that our clinical sites would act responsibly, but we found ourselves victim of suspected coordinated improprieties at a level that none of us have seen in our careers. It's just so unusual. There's just no other way of describing it.

85. During a question-and-answer portion of the November 29, 2023 call, Defendant Do acknowledged:

> What's very very clear to us here is that monitoring, on-site monitoring of what was going on was not where it needed to be, right, and so frankly one of the things we will do is what I have done for my other clinical trials in Asia for example, is we are going to take a belt-and-suspenders approach, right? In those trials I always have my own CRAs alongside the CRO's monitors out at the sites, right, and we are essentially going to go with more established sites that have conducted more of these Alzheimer trials, and frankly we have changed our CRO. And so those are some of the things that we will be doing immediately and we will be working…to identify the other safeguards that we need to put in place – along with the FDA – I think the FDA will have a point of view kind of given the bit of a scandal that we have here with these sites.

86. Defendant Do also engaged in the following exchange with one analyst concerning the "big picture":

> *Analyst*: What gives you confidence, excluding these patients, that the data holds, and what would motivate a region, not just one clinical trial site to actually, you know, not run the trial the way it is designed? Like what really happened?
>
> *Defendant Do*: I don't want to start any conspiracy theories or anything else like that. And it's actually the vast majority or virtually all of 15 sites are in the same geographic area, right, and that is the reason why we have referred this thing on to the FDA to investigate because we would be just speculating, right? We do know in certain other disease that there is phenomena [of] professional patients that may be part of what is going on here but I am not going to speculate anything else.

87. Critically, instead of truthfully telling analysts and investors that he and the Company had received reports of fraudulent data as early as December 2022, Defendant Do claimed that BioVie only "started to notice higher than expected levels of deviations" in the data in July 2023 and that they "acted rapidly and vigorously, rather than ignore it because we could not condone the practices [they] uncovered, such as when multiple patients came in for an MRI scan on the same day they ended up having the same result posted with their records."

88. On this news, the price of the Company's common stock dropped over 60%, from a closing price of $4.99 on November 28, 2023, to close at $1.96 on November 29, 2023.

**THE INDIVIDUAL DEFENDANTS SOLD STOCK WHILE THEY CAUSED BIOVIE'S STOCK PRICE TO BE ARTIFICIALLY INFLATED**

89. As a result of the above false and misleading statements, the Company's share price was artificially inflated. Defendant Gorlin, while in possession of material, non-public information, capitalized on the artificially inflated stock price by selling significant portions of his holdings of BioVie common stock.

90. Defendant Gorlin sold a total of 8,560 shares on September 5, 2023, while the price of the Company's stock was artificially inflated, earning approximately $26,108 in proceeds, substantially more than what he would have earned had investors known the truth about BioVie's business operations.

91. The sale of shares by Defendant Gorlin during the Relevant Period was highly suspicious in timing (made during a time period where Defendants were making materially false statements to investors and/or failing to disclose material information that they had a duty to disclose).

92. Accordingly, Defendant Gorlin was motivated to make materially false and misleading statements and conceal material adverse information from investors so that he could personally profit from the artificial inflation in the trading price of BioVie's common stock resulting from Defendants' false and misleading statements and omissions during the Relevant Period and before the truth was disclosed to the investing public.

**DAMAGES TO BIOVIE**

93. As a direct and proximate result of the Individual Defendants' misconduct, BioVie has expended and will continue to expend many millions of dollars.

94. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

95. Such expenditures will also include costs incurred in any internal investigation

pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

96. As a direct and proximate result of the Individual Defendants' conduct, BioVie has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

97. Plaintiff brings this action derivatively in the right of and for the benefit of BioVie to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, unjust enrichment, and other wrongful conduct as alleged herein.

98. BioVie is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

99. Plaintiff is an owner of BioVie stock and has been a continuous shareholder of Company stock at all relevant times.

100. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

101. A pre-suit demand on the Board is futile and therefore, excused. At the time this suit was filed, the Board consisted of the following six individuals: Defendants Do, Rogich, Lang, and Sherman (the "Director Defendants") and non-parties Anne Chappell and Kameel Farag. Plaintiff is required to show that a majority of the current Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

102. Each of the Director Defendants face a likelihood of liability in this action

because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

103. The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

104. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and, with gross negligence, disregarded the wrongs complained of herein and are therefore not disinterested parties.

105. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements and omissions, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

106. Additional reasons that demand on Defendant Do is futile follow. Defendant Do has served as a Company director since 2016 and as the Company's CEO and President since April 2021. Defendant Do is therefore incapable of considering demand because he (as its CEO) is an employee of the Company who, as detailed above, derives substantial income from his employment with BioVie, rendering him not independent. Defendant Do signed the 2023 10-K, which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Do breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

107. Additional reasons that demand on Defendant Lang is futile follow. Defendant Lang has served as a Company director since 2016 and as Chairman of the Board since March 2023. The Company provides Defendant Lang with significant compensation as detailed above. Defendant Lang signed the 2023 10-K, which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Lang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

108. Additional reasons that demand on Defendant Rogich is futile follow. Defendant Rogich has served as a Company director since June 2020. The Company provides Defendant Rogich with significant compensation as detailed above. Defendant Rogich signed the 2023 10-K, which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Rogich breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

109. Additional reasons that demand on Defendant Sherman is futile follow. Defendant Sherman has served as a Company director since 2017. The Company provides Defendant Sherman with significant compensation as detailed above. Defendant Sherman signed the 2023 10-K, which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Sherman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

110. Further, Defendants Lang and Rogich served as members of the Audit Committee during the Relevant Period, and thus had greater responsibilities by virtue thereof. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, (i) overseeing the integrity of the Company's financial statements, reporting processes, and internal controls, (ii) legal and regulatory compliance, and (iii) otherwise meeting their responsibilities set out in the Audit Committee Charter, as set forth herein. Despite this, Defendants Lang and Rogich failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendants Lang and Rogich face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is therefore futile.

111. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

112. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

113. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

114. Publicly traded companies, such as BioVie, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

115. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, therefore, excused.

## <u>COUNT ONE</u>

### Against the Individual Defendants for Breach of Fiduciary Duties

116. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of BioVie's business and affairs.

118. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

119. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of BioVie.

120. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

121. In further breach of their fiduciary duties owed to BioVie, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (i) the numbers of patients enrolled in the NM101 Study; (ii) the expected timing of primary completion of the Study; (iii) optimism about blinded data; and (iv) risks related to the clinical trial process. As a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

122. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

123. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

124. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

125. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

126. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, BioVie has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

127. Plaintiff on behalf of BioVie has no adequate remedy at law.

## COUNT TWO

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

128. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their

fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

130. Plaintiff, on behalf of BioVie, has no adequate remedy at law

**COUNT THREE**

**Against the Individual Defendants for Unjust Enrichment**

131. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, BioVie.

133. The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from BioVie that was tied to the performance or artificially-inflated valuation of BioVie or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

134. Plaintiff, as a shareholder and a representative of BioVie, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

135. Plaintiff on behalf of BioVie has no adequate remedy at law.

**COUNT FOUR**

**Against the Individual Defendants for Waste of Corporate Assets**

136. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

137. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

138. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

139. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

140. Plaintiff on behalf of BioVie has no adequate remedy at law.

**COUNT FIVE**

**Against Defendant Gorlin for Insider Trading**

141. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142. By reason of his fiduciary role as a director of the Company, Defendant Gorlin specifically owed the Company the highest obligation of due care, good faith, and loyalty.

143. As a director of the Company, Defendant Gorlin was given access to material information about the Company, as described above, which was not generally available to the public.

144. When Defendant Gorlin sold his Company stock, as detailed *supra*, he was in possession of material, non-public information described above, and sold Company stock on the basis of such information.

145. The information described above was proprietary, non-public information concerning the Company's business operations and financial condition. It was a proprietary asset

belonging to the Company, which Defendant Gorlin misappropriated to his own benefit when he sold holdings in Company stock. Defendant Gorlin knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

146. As the use of the Company's proprietary information for his own gain constitutes a breach of Defendant Gorlin's fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of BioVie and that Plaintiff is a proper and adequate representative of the Company;

B. Against all of the Defendants and in favor of BioVie for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding BioVie restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 11, 2025

Respectfully submitted,

**MUEHLBAUER LAW OFFICE, LTD.**

/s/__Andrew R. Muehlbauer____________
Andrew R. Muehlbauer
Nevada Bar No. 10161
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702.330.4505
Facsimile: 702.825.0141
Email: andrew@mlolegal.com

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Clint Wilkerson am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

9/5/2025

Signed by:
Clint Wilkerson
3C12D6E462634EB
Clint Wilkerson